# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

LESLIE A. AMES,  :
                 :
        Plaintiff  :
                 :    No. 3:11-CV-1775
    vs.          :
                 :    (Judge Nealon)
MICHAEL J. ASTRUE,  :
COMMISSIONER OF SOCIAL  :
SECURITY,        :
                 :                    **FILED**
        Defendant  :                  **SCRANTON**

## MEMORANDUM
                                      FEB 0 4 2013

**Background**                        PER _____
                                      DEPUTY CLERK

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Leslie A. Ames's claim for social security disability insurance benefits.

Ames protectively filed her application for disability insurance benefits on November 16, 2009. Tr. 149.[1] The application was initially denied by the Bureau of Disability Determination[2] on March 12, 2010. Tr. 16 and 106-117. On April

---

1. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on December 19, 2011.

2. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 106.

27, 2010, Ames requested a hearing before an administrative law judge. Tr. 16 and 118-119. After about 11 months had passed, a hearing was held on March 16, 2011, before an administrative law judge. Tr. 34-69. On April 20, 2011, the administrative law judge issued a decision denying Ames's application. Tr. 16-27. On May 2, 2011, Ames filed a request for review with the Appeals Council and on July 28, 2011, the Appeals Council concluded that there was no basis to grant Ames's request for review. Tr. 1-6 and 11-12.

Ames then filed a complaint in this court on September 26, 2011. Supporting and opposing briefs were submitted and the appeal[3] became ripe for disposition on March 21, 2012, when Ames filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Ames met the insured status requirements of the

---

3. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Social Security Act through December 31, 2011. Tr. 18 and 137.[4]

Ames, who was born in the United States on April 25, 1964, graduated from high school and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 152, 157 and 164. During her elementary and secondary schooling, Ames attended regular education classes. Tr. 157. After high school, Ames attended college for a month and received some training in "legal office procedures." Tr. 42 and 58.

Ames had employment as a forklift operator, which was described by a vocational expert as semi-skilled, medium work; a secretary, which was described as skilled, sedentary work; a counter clerk at a car rental business, which was described as semi-skilled, light work; and a self-employed housekeeper, which

---

4. The record erroneously indicates in three places that the date last insured was December 21, 2011. Tr. 16, 18 and 149. It is the Court's understanding and general experience that the date last insured falls on the last day of a quarter. See Program Operation Manual System (POMS), Section RS 00301.148, https://secure.ssa.gov/poms.nsf/lnx/0300301148 (Last accessed January 10, 2013). In order to establish entitlement to disability insurance benefits, a claimant is required to establish that on or before the date last insured, he or she suffered from a disability which had lasted for a continuous period of 12 months or was expected to last for a continuous period of 12 months. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

was described as semi-skilled, medium work.[5] Tr. 58. The

administrative law judge found that Ames's past relevant

---

5. The terms sedentary, light and medium work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

20 C.F.R. § 404.1567.

employment[6] was as a forklift operator, secretary, legal secretary, counter rental clerk and self-employed housekeeper. Tr. 25.

Ames's work history covers the years 1980, 1982 through 1990, and 1992 through 2006, a total of 25 years. Tr. 138. Ames's total earnings during those years were $278,838.32. Id. Her annual earnings ranged from a low of $14.88 in 1980 to a high of $24,261.61 in 2002. Id.

Ames claims that she became disabled on September 1, 2006, because of both physical and mental impairments. The physical impairments alleged include neck, shoulder, back and leg pain. Tr. 52, 95, 106 and 152. The back pain was alleged to be caused, inter alia, by degenerative disc disease/spondylosis and radiculopathy.[7] Tr. 37 and 52. The primary mental impairment

6. Past relevant employment in the present case means work performed by Ames during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs. The intervertebral discs, the soft cushions between 24 of the bony vertebral bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge (protrusion) is where the annulus of the disc extends beyond the perimeter of the vertebral bodies. A herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus and presses the annulus outward or ruptures the annulus. Such bulges (protrusions) and herniations, if they contact nerve

tissue, can cause pain. Degenerative disc disease (discogenic disease) has been described as follows:

As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. . . Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative disc disease.

Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.

Degeneration of the disc tissue makes the disc more susceptible to herniation. Degeneration of the disc can cause local pain in the affected area. Any level of the spine can be affected by disc degeneration. When disc degeneration affects the spine of the neck, it is referred to as cervical disc disease. When the mid-back is affected, the condition is referred to as thoracic disc disease. Disc degeneration that affects the lumbar spine can cause chronic low back pain (referred to as lumbago) or irritation of a spinal nerve to cause pain radiating down the leg (sciatica). Lumbago causes pain localized to the low back and is common in older people. Degenerative arthritis (osteoarthritis) of the facet joints is also a cause of localized lumbar pain that can be detected with plain x-ray testing is also a cause of localized lumbar pain. The pain from degenerative disc disease of the spine is usually treated conservatively with intermittent heat, rest, rehabilitative exercises, and medications to relieve pain, muscle spasms, and inflammation.

alleged is a depressive disorder. Tr. 37.

For the reasons set forth below, the Court will remand the case to the Commissioner for further proceedings.

**Standard of Review**

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com, http://www.medicinenet.com/degenerativedisc/page2.htm (Last accessed January 10, 2013). Degenerative disc disease is considered part of the normal aging process. Id.
Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com /radiculopathy/article.htm (Last accessed January 10, 2013). A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id. However, "the majority of patients respond well to conservative treatment options." Id. Radiculitis is "inflamation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary, 1571 (32nd Ed. 2012).

to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.

8

Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record.  Shaw v. Chater, 221 F.3d 126, 131

9

(2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or

8. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

9. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R.

11

combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A

---

§§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## Medical Records

Before the Court addresses the administrative law judge's decision and the arguments of counsel, the Court will review in detail some of Ames's medical records. The Court will primarily focus on medical records of treatment received by Ames after the alleged disability onset date of September 1, 2006.

On March 24, 2004, Ames underwent an MRI of the lumbar spine at Thorn Run MRI, Heritage Valley Health Center, Moon Township, Pennsylvania. Tr. 200. The MRI scans were interpreted by Thomas Kavic, M.D., whose impression was as follows: "1. MRI demonstrates findings compatible with mild left lateral disc bulge at L2-3 including degenerative disc disease. (2) There is a mild posterior bulge at L3-4. There is some mild degenerative disc

disease at L4-5." Id. Dr. Kavic also noted in the report of the MRI that there was "no significant spinal canal stenosis." Id.

The medical records prior to October 1, 2007, are very limited, as well as mostly handwritten and at times illegible, but appear to reveal that Ames received conservative treatment at Heritage Valley Health Center for left shoulder and left-sided low back pain in the form of pain medications, including lumbar spine epidural steroid injections. Tr. 213-236. She received the epidural steroid injections in 2004 and 2005. Id. She also received treatment for high blood lipid levels. Id. She was prescribed several medications, including Naproxen,[12] Vicodin,[13] Toradol,[14] Hydrocodone APAP, and Zocor.[15] Id. The record further

12. Naproxen (brand names include Aleve, Anaprox, Naprosyn) is a nonsteroidal anti-inflammatory pain medication used to treat conditions such as arthritis and tendinitis, Naproxen, Drugs.com, http://www.drugs.com/naproxen.html (Last accessed January 10, 2013).

13. Vicodin is a combination of acetaminophen and hydrocodone, a narcotic pain reliever. Vicodin, Drugs.com, http://www.drugs.com/vicodin.html (Last accessed January 10, 2013).

14. Toradol is a nonsteroidal anti-inflammatory pain medication. Toradol, Drugs.com, http://www.drugs.com/toradol.html (Last accessed January 10, 2013).

15. Zocor (simvastatin) is used to reduce blood lipid levels. Zocor, Drugs.com, http://www.drugs.com/zocor.html (Last accessed January 10, 2013).

14

indicates that she received physical therapy and chiropractic treatments for the low back condition prior to receiving the epidural steroid injections. Tr. 222.

On October 1, 2007, Ames had an appointment with Mark Murnin, D.O., her primary care physician, at Horizon Medical Corporation, PC. Tr. 356-358. At that appointment, Ames complained of left shoulder pain, back pain and anxiety. Tr. 356. The report of this appointment notes that it was a follow-up appointment for Ames's complaints of anxiety.[16] Id. Ames told Dr. Murnin with respect to her back pain that she "felt better compared to last visit" and that her "condition has been mostly well-controlled since last visit." Id. Ames stated that she was taking her medications as prescribed and that she had no side effects. Id. Her current medications were listed as Lorazepam,[17] Simvastatin, Naproxen, Hydrocodone-APAP and Skelaxin.[18] Id. Ames

16. Other than very brief handwritten notes by Dr. Murnin of an appointment Ames had with him in 2004 we did not discover in the administrative record any treatment records from Dr. Murnin prior to October 1, 2007. Tr. 257.

17. Lorazepam (brand name Ativan) is a benzodiazepine drug used to treat anxiety disorders. Lorazepam, Drugs.com, http://www.drugs.com/lorazepam.html (Last accessed January 10, 2013).

18. Skelaxin (generic metaxalone) is a muscle relaxant "used together with rest and physical therapy to treat discomfort associated with acute skeletal muscle conditions such as pain and

rated her back pain "as moderate in severity" and her left shoulder pain "as severe." Id. Ames stated that her back pain was present for years and her shoulder pain for 3 months. Id. It was stated that Ames's anxiety was "mostly well controlled since last visit" and Ames denied "associated depression and panic attacks." Dr. Murnin noted that Ames reported that she was exercising. Id. The results of a physical examination were essentially normal. Tr. 357. The only negative (abnormal) observations were that Ames had mild tenderness of the left shoulder and limited range of motion of the left shoulder. Id. Ames had a normal gait and strength; straight leg raising tests were negative both on the left and the right; Ames was able to heel and toe walk; and even though she had tenderness in the left shoulder, she had normal strength (5/5). Id. Dr. Murnin's assessment was anxiety state unspecified, hypercholesterolemia pure,[19] back pain, and shoulder pain. Tr-357-358. Ames's current medications were continued, including Lorazepam, and an MRI of the

injury." Skelaxin, Drugs.com, http://www.drugs.com/skelaxin.html (Last accessed January 10, 2013).

19. Hypercholesterolemia pure is an inherited condition which causes high blood lipid levels.

16

shoulder was ordered. _Id._ Ames was advised to avoid any heavy lifting and instructed on proper lifting. Tr. 358.

On October 2, 2007, Ames had an MRI of the left shoulder performed at NEP Imaging Center. Tr. 318. The MRI scans were interpreted by Timothy Braatz, M.D., whose impression was as follows: "1. There is tendinopathy of the supraspinatus tendon. There is mild bursal thickening versus a minimal amount of fluid within the subdeltoid/subacromial bursa noted. Bursal thickening can be secondary to tendinopathy. 2. There is moderate subcoracoid bursitis. 3. Mild acromioclavicular degenerative changes are noted. 4. There is probable degenerative signal change seen involving the labrum without a discrete tear." _Id._

On November 12, 2007, Ames had an appointment with Dr. Murnin. Tr. 353-355. At that appointment, Ames complained of anxiety and back pain. Tr. 353. The report of this appointment notes that it was a follow-up appointment for Ames's complaints of anxiety. _Id._ Ames told Dr. Murnin with respect to her back pain that she was "[f]eeling about the same compared to the last visit" and that her "[c]ondition has been mostly well-controlled since last visit." _Id._ Ames stated that she was taking her medications as prescribed and that she had no side effects. _Id._ Her current medications were listed as Lorazepam, Simvastatin, Naproxen and

17

Hydrocodone-APAP. Ames rated her back pain "as moderate in severity" and indicated it was "[p]resent for years." Id. Ames reported suffering from anxiety but it was "well-controlled since last visit" and she denied "associated depression and panic attacks." Id. The results of a physical examination were completely normal. Tr. 354. Dr. Murnin's assessment was anxiety state unspecified, hypercholesterolemia pure, back pain, and shoulder pain. Id. Ames's current medications were continued. Id. Ames was advised to avoid any heavy lifting and instructed on proper lifting. Tr. 355.

On February 6, 2008, Ames had an appointment with Kevin R. Colleran, M.D., of Professional Orthopaedic Associates, LTD. Tr. 260. The report of this appointment indicates it was a "follow up of her shoulder/upper neck pain."[20] Id. Ames at this appointment stated that she felt her symptoms were "really not improving." Id. It was noted that Ames had "two injections with little to no relief of her shoulder pain" and that she was having "chronic low back issues." The results of a physical examination were essentially normal. Id. The only negative observations were

_____

20. The medical records appear to be incomplete. The Court's review of the administrative record did not reveal any prior or subsequent medical records from Dr. Colleran.

18

that Ames had "posterior left-sided neck tenderness and some spasm" and "[s]ome [acromioclavicular] joint tenderness . . . but it appears more muscular in the posterior joint region." _Id._ Also, it was stated without providing any details that Ames had "chronic low back issues." _Id._ Dr. Colleran's assessment was that Ames suffered from cervical pain possibly contributing to referred shoulder pain and chronic low back/sacroiliac joint pain. _Id._ He further stated that the primary source of her pain did not appear to be the shoulder. _Id._ Dr. Colleran referred Ames to physical therapy and prescribed the nonsteroidal anti-inflammatory drugs Voltaren and Naprosyn. _Id._

On February 7, 2008, Ames had an appointment with Dr. Murnin. Tr. 351-352. At that appointment, Ames complained of anxiety and neck pain. Tr. 351. The report of this appointment notes that it was a follow-up appointment for Ames's complaints of anxiety. _Id._ Ames told Dr. Murnin with respect to her neck/shoulder pain that it was about the same and that she was starting physical therapy and being seen by Dr. Colleran. _Id._ Ames stated that she was taking her medications as prescribed and that she had no side effects. _Id._ Her current medications were listed as Lorazepam, Simvastatin, Naproxen and Hydrocodone-APAP. _Id._ Ames reported suffering from anxiety but it was "well-

controlled since last visit" and she denied "associated depression and panic attacks." Id. The results of a physical examination were essentially normal. Tr. 351-352. The only negative observations were that Ames had tenderness in the neck and she had limited cervical range of motion. Tr. 352. Dr. Murnin's assessment was anxiety state unspecified, hypercholesterolemia pure, pain in the shoulder joint, and cervicalgia.[21] Id. Ames's current medications were continued. Id. Ames was "[a]dvised to exercise 30 minutes of continuous aerobic exercise three times per week." Id.

On April 2, 2008, Ames had an appointment with Dr. Murnin. Tr. 360-361. Ames's chief complaint at this appointment was reported to be myalgias (i.e., muscle pain). Tr. 360. It was also stated that she had persistent neck pain which radiated to both arms, chronic back pain for at least 5 years and some leg pain, left greater than the right. Id. Ames denied suffering from anxiety or depression. Id. Her current medications were listed as Lorazepam, Naproxen and Hydrocodone-APAP. Id. The

---

21. Cervicalgia is neck pain which does not radiate outward to the arms, i.e., localized neck pain. Cervicalgia, MedConditions.net, Dictionary of medical conditions terminology, http://medconditions.net/cervicalgia.html (Last accessed January 10, 2013).

results of a physical examination were essentially normal. Tr. 360-361. The only negative observations were that Ames had paravertebral spasm in the neck along with decreased range of motion and back spasms. Tr. 361. Dr. Murnin's assessment was myalgia (muscle pain) and myositis (muscle inflammation) unspecified, cervicalgia, back pain and hypercholesterolemia pure. Id. With regard to the myalgia/myositis diagnosis, Dr. Murnin ordered a series of blood tests and discontinued the drug simvastatin for the time being.[22] Id. Dr. Murnin also ordered an MRI of the cervical spine and a physiatry consult. Id. Ames's current pain medications were continued. Id. Ames was "[a]dvised to exercise 30 minutes of continuous aerobic exercise three times per week." Id.

On April 8, 2008, Ames had an MRI of the cervical spine at NEP Imaging Center. Tr. 319. The MRI scans were interpreted by Christopher N. Hobbie, M.D., whose impression was as follows:

"Left-sided disc herniation seen at C4-5 and C5-6 with left anterolateral recess narrowing as well as left-sided neural

_____

22. It appears that Dr. Murnin was concerned that Simvastatin could have been causing the muscle pain and inflammation because he noted the following under the myalgia/myositis diagnosis: "discontinue simvastatin for now (I doubt it is the cause)." Tr. 361.

21

foraminal narrowing[.]" Id. This MRI report noted that there were two disc herniations and that the disc herniation at the C5-6 level resulted in moderate to severe neural foraminal narrowing and mild right neural foraminal narrowing. Id. The disc herniation at the C4-5 level resulted in mild left neural foraminal narrowing.[23] Id.

On April 9, 2008, pursuant to a referral from Dr. Murnin, Ames had a physiatric consultation with Michael Wolk, M.D., of Northeastern Rehabilitation Associates, P.C., Scranton, Pennsylvania. Tr. 272-273. The results of a physical examination were essentially normal except for spasm in the left paraspinal musculature and left trapezius. Tr. 273. Dr. Wolk reviewed the results of the recent MRI of the cervical spine and noted that the neural foramen (openings through which nerve roots exit) were impacted. Id. Dr. Wolk's assessment was that Ames suffered from cervical discogenic syndrome and referred Ames to physical therapy and prescribed pain medications and the muscle relaxant Flexeril. Id.

On May 22, 2008, Ames had an appointment with Dr. Murnin at which she complained of pain radiating down her left leg and

_____

23. See fn.7, supra.

numbness.  Tr. 348-350.  Ames denied suffering from anxiety or depression.  Tr. 348.  Her current medications were listed as Lorazepam, Naproxen and Hydrocodone-APAP.  Id.  Ames stated that she was taking her medications as prescribed and that she had no side effects.  Id.  The results of a physical examination were essentially normal.  Tr. 348-349.  The only negative observations were that Ames had mild spasm of the paravertebral muscles and mildly limited cervical range of motion.  Tr. 349.  Dr. Murnin's assessment was hypercholesterolemia pure, back pain, anxiety state unspecified, insomnia, neuritis or radiculitis of the thoracic or lumbosacral spine unspecified, and brachial neuritis or radiculitis not otherwise specified.  Tr. 349-350.  Dr. Murnin ordered an MRI of the lumbar spine.  Tr. 350.  Ames's current medications were continued.  Tr. 349-351.

Ames, also on May 22, 2008, had an appointment (a follow-up physiatric evaluation) with Dr. Wolk.  Tr. 271 and 278.  Ames's chief complaint at that appointment was left sided neck pain and left upper extremity pain.  At that appointment, Ames told Dr. Wolk that "she did not go through [physical] therapy" because "she had the therapy previously and it was not beneficial."  Id.  Ames further reported that "the medications provide some relief at least taking the edge off some of her

23

symptoms but her symptoms still are not tolerable." Id. Ames was taking Flexeril and Ultracet.[24] Id. She stopped taking Naprosyn because it did not provide any relief. Id. Her pain was moderate to severe "in the left side of the neck, left trapezius area, left interscapular area" and "continue[d] to limit her on a daily basis, even with activities of daily living, worse with prolonged positions." Id. Dr. Wolk noted that the physical examination at this appointment was brief and most of the time was spent reviewing Ames's MRI of the cervical spine and the procedures for an epidural steroid injection. Id. Dr. Wolk's impression was that Ames suffered from "C4-C5, C5-C6 left sided disc herniation." Id. Dr. Wolk scheduled Ames for an epidural steroid injection. Id.

On May 28, 2008, Ames had an MRI of the lumbar spine performed at NEPA Imaging Center. Tr. 320-321. The MRI scans were interpreted by Johnathan Sullum, M.D., whose impression was as follows: "1. Small left-sided disc herniation L3-4 with mild compression of the left-side of the thecal sac and mild left-sided

---

24. "Ultracet contains a combination of tramadol and acetaminophen. Tramadol is a narcotic-like pain reliever. Acetaminophen is a less potent pain reliever that increases the effects of tramadol. Ultracet is used to treat moderate to severe pain." Ultracet, Drugs.com, http://www.drugs.com/ultracet.html (Last accessed January 11, 2013).

foraminal narrowing. 2. Mild L2-3, L3-4 and L4-5 degenerative disc disease. 3. Mild levoscoliosis." Id. This report also noted that at the L3-4 level there was "[a] tiny high signal intensity focus along the disc margin" which "suggest[ed] an associated annular tear."[25] Id.

On June 11, 2008, Ames was administered a fluoroscopic guided "left C6 epidural steroid injection" by Scott Naftulin, D.O., at Northeast Surgery Center. Tr. 306-309. The diagnosis prior to the injection was "cervical disc herniation/stenosis /radiculopathy."[26] Tr. 293. It was reported that Ames "tolerated the procedure well and was discharged after an appropriate period of observation." Id.

On June 20, 2008, Ames had a follow-up appointment with Dr. Wolk. Tr. 276-277. Her chief complaint was neck and low back pain. Id. It was noted that Ames reported that after the cervical epidural steroid injection, her symptoms in the neck became "tolerable" but that she now was "having more pain in the lumbar spine with radiation [] to the left lateral thigh." Id. Dr. Wolk noted that this complaint was "consistent with the MRI of

25. See fn.7, *supra*.

26. Stenosis is the narrowing of the spinal canal and it can also refer to the narrowing of the neural foramen.